D'Alevi, Leeds, Morelli, and Prudential Financial, 21-3069. Thank you. Thank you. Hold on one second. Counselor. Good morning, Your Honor. I see the timer shows three minutes. Good morning, Your Honor. Hold on one second, Counselor. We want to be able to hear you when there's all the people are coming in and out. I want you to be able to hear me. Good.  Good morning, Your Honors. May it please the Court. My name is Max Falkenflik of Falkenflik and McGarrity LLP, Counsel for the Plaintiffs and Members of the Putative Class. Respectfully, I've reserved three minutes for rebuttal. I don't know that I have to go through in detail the factual history of the claims in the case. The Court's seen this movie before in the Nextel case. And in that case, they described the relationship between Leeds, Morelli, and Brown. And they've been sued here along with their partners and successors. I'll refer to them as Leeds. They said, the Court said in Nextel, we express our candid opinion that the arrangement was, quote, an employment contract between Nextel and LMB designed to achieve an en masse processing and resolution of claims that LMB was obligated to pursue individually on behalf of its clients. Now, that employment contract. That was written in 2011? Yes, Your Honor. That was a dozen years ago. And they were talking about stuff that had happened roughly a dozen years before that. They were talking about stuff that had happened roughly around the same time as the claims in this case. In this case, right. And in that case. Which is a quarter century ago as we stand here today. And, Your Honor. All of this is just statute of limitations. Well, I'll address the statute of limitations because I think that's obviously an important issue. Always with a case this age. But let me first address the issues with regard to the arbitration clause as to credential, if I may. The Nextel case also addresses that issue and points out that in the Nextel case, the settlement agreement between the plaintiffs and Nextel could not be enforced because it was invalid. And the settlement agreement was not a valid contract because it was obtained by LMB, while LMB suffered from an unconsensual conflict of interest. And we believe that the settlement agreement in this case, which my friend Mr. Somal will argue about, contains the same invalidity. That invalidity goes to formation of contract. It does not go to fraudulent inducement. And as the court is well aware, the issue of formation of contract, if the parties, if the plaintiffs were unable to validly consent to the settlement agreement because their ability to consent was undeniably eliminated. Fraudulently induced, I think, are the words you're looking for. No, not fraudulently induced. That people have a conflict of interest. Not fraudulently induced because I want to stay away from Buckeye. But this is the question, isn't it? I mean, what's happening here is that their agreement is at least voidable, and maybe that's another distinction that we need to get into, because they entered it under the advice of lawyers who had a conflict of interest. Your Honor, I think they did not have the capacity to enter into that agreement because their lawyers who told them to sign it had a conflict of interest. Yes. But surely they had the capacity. That's not a question of capacity. They're adults. They can sign the contract or not sign the contract, but they're victims of a certain kind of fraud by their attorneys. Yes, but I believe it goes to contract formation. And I'll address the issue. Is there a case, so I think what happened here is awful. It's shocking. But is there a case that is about New York law that explains that when you have an attorney-client relationship of this sort, and whatever it is, the contract, an issue, is the product of or follows a significant conflict of interest or a total breach of fiduciary obligations, that the contract is null and void automatically? And, Your Honor, I believe that case is Nextel. I believe Nextel says exactly that. It says that as to the settlement agreement was unenforceable. It says that exactly the question of whether that contract was enforceable. But let me address the problem. But I'm just trying to understand. This particular kind of argument wasn't at issue there as it relates to the arbitration clause as such. That's true. Suppose the clients had learned about this after the fact and they were outraged, but at the end of the day said, no, I'm satisfied with this. The contract could be ratified later. The contract could be ratified, but it wasn't. I understand it wasn't, but if it could be ratified, then is that the same thing as something that is null and void as opposed to something that is voidable if the client wants to void it? Well, Your Honor, I think that maybe I spoke too hastily. I'm not sure whether ratification would be the proper concept under these rules given the fact that they couldn't enter into the contract. But let me address the arbitration clause separately because I think that's sort of underlying the Court's concern. In addressing that, I didn't see an allegation that addressed the arbitration clause specifically as opposed to the contract as a whole. And, Your Honor, I think that you can't parse it out that way because let me explain why respectfully. The fact of the matter is that under Nextel, the Court explicitly said that LMB violated its duty and it had to, quote, give due consideration to differently different claims, differing strengths of those claims, and, and these are the important words, differing interests in one or more proper tribunals in which to assert those claims. Now, LMB did not, there's no allegation that they did, and actually the allegations are they didn't. They didn't discuss the significance of an arbitration clause, which was not just a general arbitration clause, but specifically required arbitration for the NASD or the New York Stock Exchange. Against Prudential Securities, one of the largest brokerage firms. Right, but LMB is not asserting that there should have been arbitration. They did assert that. They did, but that's not what we're talking about here. So as far as LMB, we don't have an issue about this. This is only about Prudential. And the arbitration has already taken place. Yes, so let me. And you're saying it should be, the arbitration should be void. Yes, Your Honor, I am saying that. The arbitration should be voided. I was ordered by the court. I objected to arbitration. I reserve my objection. I attend, and the court ordered me to arbitrate within a certain number of days at risk of having the case dismissed in its entirety with prejudice. Yes, and I understand all of that. But when you say you can't parse it, I'm sympathetic to that argument. On the other hand, isn't that what our case law requires you to do, requires us to do, because the case law distinguishes between something that goes to the validity of the contract as a whole and some claim that goes specifically to the arbitration clause being fraudulently induced. And you just said that, and maybe you want to rethink that, that the lawyers never said anything special about the arbitration clause. The lawyers, which lawyers? In the complaint? The LMB lawyers. The LMB lawyers didn't advise their clients about anything. Right. And so one of the And one of your clients says they, more than that, they just gave me a blank page, signature page Signature page, that's right. And I never even saw what I was signing. That's correct. I think that probably overstates it a little bit with respect to the prudential agreement, but I'm not sure whether that was just a signature page issue or not. But Section 11 of that agreement required NASD or New York Stock Exchange arbitration. And I will tell you, I've been in my own firm since 1985, litigated numerous times against brokers. I would never, ever advise my client to agree to arbitrate against a brokerage firm in front of the NASD or the New York Stock Exchange. I would think that's right. And so the question is, if LMB didn't give that focused advice, it goes to the validity of the arbitration clause itself. Now, I don't think we have to get there, because under Nextel, I think the settlement agreement's out the window. But if we do parse it out and think about the issues arising out of the line of cases after Concepcion, I think we still get to the same place, because the counsel was required to advise their clients about the strengths and weaknesses, as Nextel says, of the forms in which they should litigate. Now, remember, this was a long time ago, as Your Honor points out. Well, I didn't say that. That's a good segue, because it was a long time ago. And maybe you want to say something about the sanctions issue, which goes to both of them. I do want to say something about that, Your Honor. The issue with respect to the Leeds issue and the inquiry notice issue, finding that the plaintiffs were on notice fault, it's very clear that absent conclusive proof, the question of whether plaintiffs were on inquiry notice is a question for the trier of fact. In that case, it's Epiphany Community Nurseries, 94 New York Suffolk 7. I cited that in our brief. You know what I focused on? Articles in the New York Times, other articles, that's one thing. But there was other litigation. There were two cases that the court referred to. And there was the- And that seems to me to be something that would have certainly triggered the statute. If they knew about it, maybe. But what happened is, first of all, the Hernandez case was in New Jersey. I respectfully suggest that, judging from Judge Parker's earlier comments, a case in Idaho or Wyoming wouldn't give inquiry notice to a party who lived in the Southern District of New York. Neither would a case in New Jersey. Now, the Vaughn case, which appeared in front of Judge Cote, and I think respectfully probably colored her opinion on inquiry notice, gave Judge Cote inquiry notice of the probability that there might have been a fraud committed. Wasn't one of the plaintiffs in this case, I think it was Buckram or Moore, not Ms. Dowd, wasn't one of them actually involved in such a litigation? One of them was involved in a litigation that was pursued on the basis, solely on the basis, that Leeds not only took their $7.5 million employment fee, but they also took contingency fees from their clients. Right, but there was a litigation- As to the contingency fee. Whatever they chose to bring, whatever claims they chose to bring, it's a little hard to say, at least that that plaintiff was not fully aware of the circumstances and could have brought this claim along with that claim. Well, no, Your Honor, I don't think that that case raised the probability that they had been affronted under these claims, although it did raise the probability and the knowledge that that party had been defrauded with respect to the contingency fee. But the pleading below raised the fact that, you know, there was no indication in that case that there was anything other than the contingency fee, and Leeds denied any wrongdoing in that case, paid 55% of the fee, threatened to sue the lawyer for breach of confidentiality. So we've kept you, past your time, you did reserve some time for rebuttal. We'll hear from Leeds first. If I may make just one point, one brief point. Armstrong v. McAlpin requires not only that you have evidence of being alerted to the probability, that you were defrauded, but also that inquiry would have revealed the truth of the fraud sufficiently to bring in non-dismissible pleading. Would a lawyer who had any competence at all find the Nextel case and everything else that was going on? And would a lawyer who had competence? Yeah. Maybe, but not necessarily the parties who at that point had. At least as to the plaintiff who did bring a lawsuit. And I'm not going to say I take it. No, it's represented by Michael Gentile, who Your Honor may be familiar with, because he was the disciplinary committee counsel in the Appellate Division First Report. Who therefore would pretty clearly have been aware of the whole Leeds-Morelli. Apparently not, Your Honor, because he did not bring those other claims. So we'll hear from counsel for Leeds-Morelli. Thank you. For Mr. Schwimmer and Prudential Financial. Good morning still. Good morning still. Cheryl Corman for the Leeds defendants. The district court properly dismissed these claims. We're talking about 20-year-old claims at this point. Stats of limitations is an absolute bar at this point. We're going to look at discovery and inquiry notice. At the very least, in 1998, when these individuals were given just a signature page and asked to sign under penalties of perjury that they read the agreement and understood its terms, at that point they were on notice that there was something awry. And that's a huge red flag. And at that point, any person of ordinary reasonable intelligence would have noted the probability that there was something wrong and would have then inquired and at the very least would have asked to see those first five pages. Had they done so, the DRA specifically articulates each of the claims that they now claim were concealed from them. It specifically noted that Prudential would be paying fees. It noted that there would be an ADR process. So I read that one provision a number of different times. And you're telling me that a person who's not trained in law, trained in law, you're telling me that even a lawyer could fully understand what that provision says. It specifically, Your Honor, I believe that if you look at it, it specifically says that LMB has the obligation to explain the fee arrangement. If somebody had read it and they saw that, they would be on clear notice at that point that there was a fee arrangement and that Prudential was paying the fees. And then at that point, you have to arise a duty to ask, a duty to inquire. We're not talking about this- If you look the other way around, didn't the firm have an obligation to explain the fee arrangement with precision and clarity? Particularly since it was a highly, I mean, charitably stated unorthodox arrangement without being asked. That's what lawyers are supposed to do. Complete candor with their clients. Well, we're simply here on a statute of limitations issue. Our argument is that we did in fact tell our clients. They were fully informed throughout the process. That's our claim. That's always been our claim. That there were group meetings that are actually referred to here. Those meetings, they were informed. This is just a Monday morning quarterbacking way saying that we weren't informed. But if we look at the actual DRA, had they looked at it at that point, they would have known. Just to go back, what is it that you say would have told the clients that they should talk to their- There is a provision in the- It is understood and agreed- That LMB will advise the clients of the fee arrangement. Entered into with PSI. Yes. And what am I supposed to draw from that? That there is a separate fee arrangement outside of the particular DRA that you then have a duty to then inquire about. No, it says it is understood and agreed that Leeds will advise. Yes. So what does that tell me about- So that I've got to actually say please advise me? Yes, exactly, Your Honor. You are on notice that if it says that Leeds will advise and you're not advised, you need to then ask a question. Is there another argument? If we look past the DRA, if you look in the ensuing years, just all of the news reports and other litigations that were brought by the other parties and the other litigants that dealt with this precisely same issue that we have here would have put them on inquiry notice. And as articulated by Judge Cote, what we have here is literally old news. These claims are in excess of almost 25 years old at this point. And the fact that- And by the way, if the legal arrangement is properly characterized as such, just to go back to this provision, what would Leeds have advised the claimants about the arrangement entered into? Would it have said we're getting a kickback or- Well, the potential- We're getting a kickback or- Well- What would it have said? That there's this big ADR process that needs to be funded and that we're administering and in exchange for administering this process- Okay. We're being paid, let's say they were paid 1.5 for the first- So it would have fully disclosed what sounds like a kickback scheme? Is that your contention? Our contention is they would have been advised that in exchange for setting up the ADR process. That's why. So you're going to move on to the other dedications? No, wait. Was the arrangement that under the agreement they were asked to sign, was it unethical? Was it unethical? Yeah. No, Your Honor. I believe that if we look at the case of Martins, which is not cited in our appellate brief but cited in the underlying memos of law, it wasn't particularly an issue, but given it being asked this question right now- So in terms of handling the prudential suit, it's your position that this firm didn't do anything wrong? Martins gave a template. That was an action against Smith-Barney. Martins, which is cited in my underlying memos of law, that was a case against Smith-Barney where instead of bringing a class action case, they brought this three-step ADR process, and then those class action attorneys were sued for unethical conduct, and it was held that it was appropriate. I'm not sure of the extent of the disclosures exactly in that case. There might be some distinguishing characteristics, but it was based on that case that this process was birthed. Was birthed. Was birthed. Based on that case, Martins' case, that this process came alive and why it was then entered into. But whether or not we like what happened here, we all know that it leaves a distasteful taste in our mouths. We're not arguing that. Why does it leave a distasteful taste if you said they didn't do anything wrong? Because when you look in hindsight, that if the claimants claimed that they didn't know, then they should have been aware that their attorneys were taking in excess of $7 million in exchange for this ADR process for multiple hundreds of claimants. But the question here is the legal analysis of whether or not these individuals were on inquiry notice and whether or not had they exercised any due diligence, they would have known or had reasonable to know the probability that they were being defrauded. And I think based upon this record, the fact of the news articles, of the other litigations, that they were clearly on notice and had to do something to bring their claims. And then even Dow, who clearly is on inquiry notice in 2016 when she Googles Lee's Moralian Brown, waits more than two years from that inquiry in November of 2016 to bring this claim. That's clearly outside of reasonable time. And as to Buckram, who actually had an attorney and sued or threatened to sue. His attorney, we were told, is Mr. Gentile, who was quoted in 2000 in the New York Times as saying, this was a pattern of egregious and extortionate attorney misconduct, the likes of which I have not seen in my 20 years of prosecuting and defending lawyers. I have a response, but it's outside the record. But what happens at that point. I'm just saying in terms of whether Mr. Buckram's lawyer knew about what was the whole story of Lee's Moralian Brown. They knew. Clearly knew. And then when he was retained by 13 individuals to go and get this money back, and were able to recoup those attorney's fees, clearly at that point you knew if the attorneys were giving back their contingency fees, they were being paid by somebody else. It's just a plethora and myriad of facts here that required them to actually inquire. Is this firm still in business? Well, Mr. Lee's has passed on. He passed away. He passed away. I don't believe it's still. I mean, the other attorneys are still practicing, I believe, but I don't think that. I mean, Mr. Lee has passed away about a year ago. We'll hear from, I guess it's Prudential. Thank you. Still the morning. Yeah, just checking. I want to be precise. Thank you, Your Honor. It's Vincent Sama for the Prudential Appellees. And I'm going to be limited to addressing the arbitration issue. And I'm happy to address Nextel since you asked that question already. But they did argue Nextel before Judge Coates. And in the very next sentence when they cited Nextel, it said they wanted to challenge that the settlement agreements were fraudulently induced. And under, which you're probably fully aware of, under clear U.S. Supreme Court precedent and Second Circuit precedent, if you're challenging the entire agreement as distinct from the arbitration clause itself, that is for the arbitrator to decide. I don't think that that's, there is no dispute about that particular issue. So Judge Coates, after hearing that, and they made that argument repeatedly in their papers, and she also gave them, he did talk about Kate staying open, she gave them many post-motion opportunities to submit letters. She didn't give re-hearing, but she let them say whatever they wanted to say. So this formation contract argument is completely new, and it was- Completely new, and I think, yeah, it's inconsistent with actually the argument made below. And I believe the argument made below repetitively was fraudulent inducement. You can call fraudulent inducement as a formation argument. When you say you're fraudulently induced, that is to void or vitiate the contract. It's the same concept. So that is what happened. But Nextel did not even, and so really their reliance on Nextel below. And here, just underscores the fact that the arbitrator should decide the issue, because it's the contract itself. So based on that, and that was nothing novel for Judge Coates, because in the Vaughn case in 2004, which was another plaintiff who had entered into a settlement agreement with Prudential, filed a putative class action in this district. And in that case, the defendants, Prudential and others, moved to compel arbitration, and Judge Coates granted it. It went to the arbitration, in which they were victorious. She confirmed the award, and this court confirmed the arbitration award. So the same settlement agreement, same arbitration clause, same arbitration, came together 20 years later. So on that basis, we moved to compel. The judge, as you saw on the record, granted that, and we went to arbitration. Defender arbitration, where three arbitrators were selected by the parties. And at that arbitration, there was a hearing and argument. Everyone could submit whatever they wanted to a motion, practice, and the like. And the arguments you're hearing today from my counsel, he made them there as well. Probably a lot longer than they made them here today. So we went on, and we had the hearing, and the panel issued an award dismissing the claims. We then moved to confirm the award. The plaintiffs did not oppose that award. Now, under the Federal Arbitration Act, that is your moment to seek to vacate or object to an award. It's not later on. That's the law in the Federal Arbitration Act. They did not. They chose not to. There's allusions to bias offender, which you have to have to a specific panel. You have to have bias in a panel, not about an institution. So they never raised that. Why? Because they couldn't. And it was waived. Because once the award's confirmed, that's your time to object is passed. So we had the hearings, and it was done. So we came here before this court, and I see it pretty straightforward. I think Mextel is consistent with Buckeye and Ipcon collections in this court, which has actually sent it to an arbitrator who gave them their day, heard it, and dismissed the claim. Thank you. Thanks. Yes, let me first start with Judge Lynch's quote of Attorney Gentile. In that case, he was representing co-op city in a suit that had been brought by Leeds Morelli. I don't care whether he was right or wrong about what he said. The point is that you're raising a claim on behalf of at least one person who was represented by a lawyer who fully understood what kind of situation Leeds Morelli and Brown had. And respectfully, Your Honor, I think you misunderstand what Mr. Gentile was saying at page 229 of the joint appendix. What he was saying was that Leeds Morelli and Brown was representing its clients and shaking down defendants to try and get settlements that they didn't deserve, that the plaintiffs didn't deserve. Not that Leeds Morelli and Brown was shaking down their clients, not, as my colleague says, just taking fees to administer an arbitration process. They took $7.5 million of fees in three separate secret agreements, one of which was signed on the very day the DRA was signed and provided them with a million and a half dollars. The retainer agreement allowed them to get a 33 and a third percent contingency. What were people aware of for all these years? Nothing. Nothing, Your Honor. Now, Judge Coate was aware of the Vaughn case, but there's no showing that plaintiffs were aware of the Vaughn case. And the record is replete, not just with the allegations and the complaint, but it is obvious that Leeds Morelli and Brown and their partners, who shockingly, some of who are still practicing law, not just that they engaged in this bribery conduct, but that they also took extraordinary efforts to conceal it. The DRA itself doesn't allow you to show it to anyone by its terms. There is nothing, everything they did. They threatened to sue Mr. Gentile. Maybe I mispronounced his name before. They threatened to sue him when he brought that case on the commissions. They gave, in all of these disclosures that they cited in the record, and I've read every one of them, what they basically show is that Wall Street was complaining about Leeds Morelli and Brown, shaking them down to get unjustified settlements, not that they were selling out their clients for bribes and taking disproportionately small settlements. That is entirely different. So when you look at all of these cases, other than one employee who actually went to work for Leeds Morelli and Brown and then was later let go, Mr. Hodge, other than that one employee, there aren't any indications that the plaintiffs knew that not only that they were probably defrauded, not only they were probably defrauded, but that inquiry would have revealed the truth. Now, what happens here- Thank you very much. Okay. Thank you, Your Honor. Thank you both. We'll reserve the decision if that's helpful. That concludes today's argument calendar, and I'll ask the Court and Deputy to adjourn the Court. Thank you. The Court today is adjourned.